NO. 12-02-00321-CV



IN THE COURT OF APPEALS
 


TWELFTH COURT OF APPEALS DISTRICT



TYLER, TEXAS


THE STATE OF TEXAS FOR
§
 APPEAL FROM THE 



THE BEST INTEREST AND
§
 COUNTY COURT AT LAW



PROTECTION OF W.Y.
§
 CHEROKEE COUNTY, TEXAS

 

MEMORANDUM OPINION


 Appellant W.Y. appeals from an order of commitment for temporary inpatient mental health

services. After a hearing before a jury, the trial court ordered W.Y. committed to Terrell State
Hospital for a period not to exceed ninety days. In six issues, W.Y. asserts the evidence is legally
and factually insufficient to support the order, his constitutional rights to due process and equal
protection have been violated, and he was denied effective assistance of counsel. We affirm.


Background 

 On October 7, 2002, an application for court-ordered temporary mental health services was
filed requesting the court commit W.Y. to Terrell State Hospital for a period not to exceed ninety
days. The application was supported by a certificate of medical examination for mental illness,
prepared by a physician, Dr. Troy Caldwell, who had examined W.Y. on that day. Dr. Caldwell
diagnosed W.Y. as suffering from schizoaffective disorder, bipolar type and indicated that W.Y. is
mentally ill, likely to cause serious harm to himself, and is suffering severe and abnormal mental,
emotional or physical distress; is experiencing substantial mental or physical deterioration of his
ability to function independently; and is unable to make a rational and informed decision as to
whether or not to submit to treatment. He based this opinion on W.Y.'s pressured speech, grandiose
and tangential thought processes, and hyper-religiosity. He indicated that on October 7, W.Y. said
he was going to the bank to get "a Porsche and a couple of Benzes," that he is worth about two
million dollars, he is a preacher, and he will go to 191 countries, where seven billion people will pay
$25.00 for "the honor of his number."

 On October 3, 2002, W.Y. was examined by Dr. Cira DeLeon who then also prepared a
certificate of medical examination for mental illness. Dr. DeLeon also diagnosed W.Y. as suffering
from schizoaffective disorder, bipolar type. She found that W.Y. is mentally ill and is likely to cause
serious harm to himself and others, and is suffering severe and abnormal mental, emotional and
physical distress, is experiencing substantial mental or physical deterioration of his ability to function
independently, and is unable to make a rational and informed decision as to whether to submit to
treatment. W.Y. had been under Dr. DeLeon's care for four months. During that time W.Y. made
several statements which, in part, formed the basis of the doctor's opinion. W.Y. said, "I don't take
medications . . . I've been talking to the people on TV and they have been talking to me . . . ;" "I
can't take my medications unless I kill somebody;" "I have a special mission . . . those pills are
poison;" and "I'm Jesus." In September 2002, W.Y. assaulted staff, threw feces on an officer,
flooded his cell, and destroyed State property. Dr. DeLeon also determined that W.Y. presents a
substantial risk of serious harm to himself or others if not immediately restrained, an opinion she
based on W.Y.'s behavior and on evidence of severe emotional distress and deterioration in W.Y.'s
mental condition to the extent he cannot remain at liberty. Dr. DeLeon based this opinion on the
same statements and behavior described above.

 Dr. Caldwell testified at the hearing. He explained that he is a psychiatrist employed by a
correctional managed care organization that has a contract with the Texas Department of Criminal
Justice. His organization, Skyview Hospital, services the psychiatric needs of offenders. W.Y. was
admitted to Jester IV Hospital, another psychiatric hospital in the Texas criminal justice system, on
March 21, 2002 and transferred to Skyview in October. At the time, W.Y. was an inmate residing
in the department of criminal justice's institutional division. The doctor stated that W.Y. suffers
from schizoaffective disorder. He noted that W.Y. spoke in a rapid manner, with a lot of energy
behind his speech. W.Y. told the doctor that he is worth two million dollars and, as soon as he gets
out of prison, he plans to go to the bank and get a Porsche and a couple of "Benzs." Dr. Caldwell
concluded that W.Y. had unrealistic social judgment about how to properly use whatever resources
he had. W.Y. also told the doctor that he would go around the world preaching. W.Y. said "they"
gave him a number to go around the world with, 191 countries have this number, these countries
desire to receive the honor of his number, and seven billion people are going to pay $25.00 each for
his number. The doctor deduced these to be delusions and stated that W.Y. might get himself into
difficulties and cause harm to himself due to his delusions. 

 While speaking to Dr. Caldwell, W.Y. was grandiose, demonstrated a flippant attitude, and
spoke in a rambling, non-sensical pattern. Dr. Caldwell explained that people with the type of
mental problems W.Y. has typically also have problems of impulsive social judgment and, as a
result, they can be unpredictable. W.Y. was not taking his prescribed medication so he was given
injections of a long-acting medication. The day before the hearing, W.Y. told the doctor he planned
to make contact with Oral Roberts and anticipated becoming friends with Mr. Roberts. He planned
to preach on buses and sidewalks and use money collected from individuals who heard him preach
to pay for his basic needs. W.Y. believes he has the gift of tongues, interpreting tongues, prophecy,
and healing. He also believes he can raise the dead and that no deadly thing would harm him. 

 Dr. Caldwell also stated that, based on information he received since October 7, 2002, he
believes W.Y. is likely to cause serious harm to others. On October 14, the day before the hearing,
W.Y. said he hears messages over walkie talkies and the television and that if he got a message from
the mafia to harm someone, he might do so. Dr. Caldwell concluded that W.Y. is hallucinating and
might respond to his hallucinations by harming someone. The doctor stated that there is no less
restrictive environment than the hospital that is appropriate for W.Y. 

 On cross-examination, Dr. Caldwell explained that W.Y.'s educational level is that of about
fifth grade and his I.Q. is 78. Any self-harm or harm to others is more likely when W.Y. is not
taking his medication. The doctor admitted that the officers guarding the cells sometimes carry
walkie talkies. Dr. Caldwell testified that W.Y. has not attempted suicide or self-mutilation or
attacked any guards since March 21. His condition has improved since being admitted to the
hospital. W.Y. has the ability to dress himself and feed himself without assistance. He can take care
of his personal hygiene without assistance. He can initiate conversation and answer questions.

 On redirect, Dr. Caldwell explained that W.Y. has demonstrated the same pattern of 
abnormal symptoms since his admission to the Jester unit, with varying degrees of severity from time
to time. There is also a continuing pattern of behavior of refusing his medication. W.Y. engaged
in overt acts of vocalizations of the way he is thinking, including the statements about hearing voices
and possibly hurting someone if a voice told him to. The doctor reiterated that W.Y. is unable to
care for his basic needs, unable to keep a job and make an income, and therefore unable to obtain
food for himself. Additionally, he is unable to make wise social judgments on the outside.

 Dr. John Yarbrough, a psychologist at Skyview Hospital, testified about the results of an
interview he had with W.Y. the day before the hearing. W.Y. told Dr. Yarbrough that, if he were
released today, he might live on a reservation in New Mexico, go to the Salvation Army, or go to
Oral Roberts' seminary. Dr. Yarbrough did not consider these to be realistic options because W.Y.
had no plan for getting to any of these places. W.Y. believes he is a preacher and planned to spend
Christmas with Oral Roberts and then take over Mr. Roberts' ministry when he retires. Again, Dr.
Yarbrough believed this was unrealistic. When asked what he would do if not released, but sent to
a State hospital, W.Y. told Dr. Yarbrough he would be very displeased with that and he would have
to deal with that in some way at that time. Dr. Yarbrough did not believe W.Y. had even considered
that the hearing would not go his way. The doctor was concerned about how W.Y. might react in
light of his history of violence. He testified that the least restrictive environment appropriate for
W.Y. is a State hospital because he is still in need of treatment. W.Y.'s mental illness is not in
remission and he does not cooperate with his treatment team. 

 Dr. Yarbrough explained that W.Y. told him that the mafia had killed one of his children, he
is a consultant for the mafia, and he gets messages from the mafia through walkie talkies. W.Y. said
he would consider doing what the mafia told him to do, including hurting someone. W.Y. also said
former President Clinton had killed one of his children. Dr. Yarbrough explained that W.Y. suffers
from paranoid delusions and his statements regarding them constitute overt acts.

 On cross-examination, Dr. Yarbrough admitted that W.Y. has not attempted to hurt himself
while in the hospital, but in one instance, he kicked a door that an individual was standing beside. 
Dr. Yarbrough stated that W.Y. might be able to get a job sweeping floors, or washing windows, or
handing out leaflets, but he did not know how long W.Y. would be able to hold a job. On redirect,
Dr. Yarbrough testified that after reviewing W.Y.'s records, he was concerned about W.Y.'s pattern
of behavior. 

 W.Y. took the witness stand in his own behalf. He offered to let each juror have five or
twenty minutes to ask him ten questions apiece so they could get to know him. He told the jury he
could find a job and a way to get to Oral Roberts University. He said he was willing to take his
medication but there was no reason for him to be in a hospital. He has been in prison for ten years
and he feels he should be going home. He said he does not want to hurt himself or anyone else. He
is capable of dressing himself and feeding himself. He explained that if he were released he would
take a bus to Oral Roberts University and apply to be a preacher. He said he has two trades,
preaching and painting. He knows what to do if his house is on fire or if he broke a leg. He knows
what to do if he gets hungry. If released, he would go to the Salvation Army or rent a room because
his father is in jail and he does not know the location of other family members.

 W.Y. denied getting messages from the mafia by walkie talkie. He explained that he is a
mafia advisor regarding topics such as how often to wash your car, whether you need more exercise,
and whether the mafia needs to kill fewer people and mind its own business sometimes. Whenever
the mafia asks him for advice, he always gives it to them, like Ann Landers. At this point in the
proceedings, W.Y. asked to borrow the trial judge's Bible and then read a long passage from
Revelation, chapter twelve. He explained that the passage is about his life and the woman in the
passage was with him in his cell while he was locked up. The woman had his baby, but the baby was
killed. He stated that he is not crazy because Revelation is a real book. With the mafia's help, he
hid the woman for a long time. She is no longer hidden away from the dragon and he is looking
forward to seeing her again. 

 The jury found that W.Y. is mentally ill and is likely to cause serious harm to himself and
others. It also found that, if not treated, he will continue to suffer severe and abnormal mental,
emotional, or physical distress and will continue to experience deterioration of his ability to function
independently. Finally, the jury found that W.Y. is unable to make a rational decision as to whether
to submit to treatment. The trial court entered an order reflecting these findings and ordering W.Y.
committed to Terrell State Hospital for inpatient care for a period not to exceed ninety days.


Sufficiency of the Evidence

 In his first issue, W.Y. asserts the evidence is neither legally nor factually sufficient to
support the order of commitment. He argues that Dr. Caldwell's conclusions that W.Y. could be
harmed by acting on his delusional beliefs are insufficient to support commitment. Further, bare
psychiatric opinion of a potential danger to others is insufficient to support a commitment. W.Y.
also contends that, contrary to Dr. Caldwell's testimony, W.Y.'s words do not constitute a recent
overt act and cannot justify his involuntary commitment. Evidence that W.Y. may be mentally ill
does not satisfy the statutory standard. Additionally, W.Y.'s refusal to take his medication cannot
be grounds for involuntary commitment. Therefore, he argues, the State failed to show a recent overt
act or a continuing pattern of behavior tending to confirm the likelihood of serious harm to W.Y. or
others, or of his distress and the deterioration of his ability to function. Thus, he argues, the State
failed to meet its evidentiary burden under the statute. 

 In a legal sufficiency review where the burden of proof is clear and convincing evidence, the
reviewing court must consider all of the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or conviction that its
finding was true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). The reviewing court must assume
that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do
so. Id. A court should disregard all evidence that a reasonable factfinder could have disbelieved or
found to have been incredible. Id. 

 In addressing a factual sufficiency of the evidence challenge, this court must give due
consideration to evidence that the factfinder could reasonably have found to be clear and convincing. 
In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). We must determine whether the evidence is such that
a factfinder could reasonably form a firm belief or conviction about the truth of the State's
allegations. Id. "If, in light of the entire record, the disputed evidence that a reasonable factfinder
could not have credited in favor of the finding is so significant that a factfinder could not reasonably
have formed a firm belief or conviction, then the evidence is factually insufficient." In re J.F.C.,
96 S.W.3d at 267.

 The trial judge may order a proposed patient to receive court-ordered temporary inpatient
mental health services if the judge or jury finds, from clear and convincing evidence, that the
proposed patient is mentally ill and, as a result of the mental illness he is likely to cause serious harm
to himself, is likely to cause serious harm to others, or is (i) suffering severe and abnormal mental,
emotional, or physical distress, (ii) experiencing substantial mental or physical deterioration of his 
ability to function independently, which is exhibited by his inability, except for reasons of indigence,
to provide for his basic needs, including food, clothing, health, or safety, and (iii) unable to make
a rational and informed decision as to whether or not to submit to treatment. Tex. Health &
Safety Code Ann. § 574.034(a) (Vernon 2003). To be clear and convincing under this statute, the
evidence must include expert testimony and, unless waived, evidence of a recent overt act or a
continuing pattern of behavior that tends to confirm either the likelihood of serious harm to the
proposed patient or others, or the proposed patient's distress and the deterioration of his ability to
function. Tex. Health & Safety Code Ann. § 574.034(d) (Vernon 2003). 

 The State provided expert testimony explaining that W.Y. is mentally ill and describing 
overt acts by W.Y. which occurred in the month before the hearing. According to Dr. DeLeon's
certificate of medical examination for mental illness, W.Y. assaulted staff members, threw feces on
an officer, flooded his cell, and destroyed State property in September 2002. To the extent Dr.
Caldwell's statement that W.Y. had not attacked any guards since March 21, 2002 conflicts with Dr.
DeLeon's statement, we assume the jury disregarded the conflicting evidence. This expert testimony
of overt acts tends to confirm the likelihood of serious harm to others. Dr. Caldwell described
behaviors showing W.Y. has unrealistic social judgment based on delusional thinking. Such poor
judgment could lead to harm to W.Y. Further, W.Y. might harm someone if he believes the mafia
wants him to. The expert testimony of a continuing pattern of behavior tends to confirm the
likelihood of serious harm to others and to W.Y. 

 Dr. Caldwell explained that W.Y. is unable to hold a job and is therefore unable to function
independently as he cannot provide for his basic needs. Dr. Yarbrough also testified that W.Y. is
delusional and does not cooperate with his treatment team. Considering all the evidence in the light
most favorable to the findings, we conclude a reasonable trier of fact could have formed a firm belief
or conviction that these findings were true. See In re J.F.C., 96 S.W.3d at 266. This evidence
satisfies the statutory requirement for clear and convincing evidence in support of the order for
temporary inpatient mental health services. See Tex. Health & Safety Code Ann. § 574.034(d). 
The evidence is legally sufficient to support the trial court's order. See In re J.F.C., 96 S.W.3d at
266.

 In addressing W.Y.'s factual sufficiency complaint, we consider the evidence the factfinder
could reasonably have found to be clear and convincing. In re C.H., 89 S.W.3d at 25. W.Y. denied
having the intent to hurt himself or anyone else. He also stated that, if released, he would take his
medication. There was some evidence that W.Y. might be able to get a job, but other evidence casts
doubt on whether he could function in the workplace or keep a job. While W.Y. explained his plan
for getting to Oral Roberts University, the jury also heard evidence that W.Y.'s educational level is
that of about fifth grade and he has an IQ of 78. Thus, his plan to attend the university seems
unrealistic. The conflicting evidence about whether he had attacked any guards since March 21 is
not so significant that the jury could not have formed a firm belief that W.Y. is likely to cause
serious harm to others. In light of the entire record, we cannot say that the jury could not reasonably
form a firm belief or conviction that W.Y. is likely to cause harm to himself and others, that he is
distressed, and that his ability to function has deteriorated, thereby requiring inpatient mental health
services. See id. Thus, the evidence is factually sufficient to support the jury's findings. Because
we hold the evidence is both legally and factually sufficient to support the trial court's order, we
overrule W.Y.'s first issue.


Constitutional Claims

 In his second and third issues, W.Y. contends the trial court erred in rendering judgment in
violation of state and federal guarantees of due process. He asserts that certain terms found in
section 574.034 of the Health and Safety Code are overly broad, vague, and ambiguous so the statute
is susceptible to a variety of interpretations, making it violative of the due process clause of each
constitution. In his fourth and fifth issues, he asserts that application of section 574.034 results in
a violation of his right to equal protection under both the state and federal constitutions.

 W.Y. did not complain to the trial court that his state and federal constitutional rights to due
process and equal protection were being violated. A constitutional claim must have been asserted
in the trial court to be raised on appeal. Dreyer v. Greene, 871 S.W.2d 697, 698 (Tex. 1993). 
Therefore, W.Y. has not preserved these complaints for review. We overrule W.Y.'s issues two,
three, four, and five.


Ineffective Assistance of Counsel

 In his sixth issue, W.Y. contends he was denied effective assistance of counsel because trial
counsel failed to object to the constitutionality of the applicable statutes. He argues that this resulted
in his being subjected to unconstitutional statutes at trial and the loss of relief due to waiver on
appeal. 

 The United States Supreme Court has established a two-part test, also adopted by Texas
courts, to determine whether the representation of counsel was effective. The defendant must show
that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is
a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings
would have been different. Strickland v. Washington, 466 U.S. 668, 687-88, 104 S. Ct. 2052, 2064,
80 L. Ed. 2d 674 (1984). Counsel is presumed to have rendered adequate assistance and made all
significant decisions in the exercise of reasonable professional judgment. Strickland, 466 U.S. at
689, 104 S. Ct. at 2065. The appellant has the burden of proving ineffective assistance of counsel
claims by a preponderance of the evidence. Jackson v. State, 973 S.W.2d 954, 956 (Tex. Crim.
App. 1998). Claims of ineffective assistance of counsel must be supported by the record. See
Mercado v. State, 615 S.W.2d 225, 228 (Tex. Crim. App. [Panel Op.] 1981). When the record
contains no evidence of the reasoning behind counsel's conduct, we cannot conclude counsel's
performance was deficient. Jackson v. State, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994).

 The record is silent as to counsel's trial strategy. We have no evidence from counsel's
perspective concerning whether he considered challenging the constitutionality of section 574.034
and, if so, the reasons he decided not to. Therefore, we are unable to determine that the failure to
raise those issues in the trial court constitutes ineffective assistance of counsel. Jackson, 877
S.W.2d at 771. W.Y. has failed to show that his counsel's performance fell below the objective
standard of reasonableness. Further, even if we agreed that trial counsel's performance was
deficient, W.Y. has failed to make any showing that he was prejudiced as a result. W.Y. alludes to
the fact that, had counsel made the objections, the trial court might have agreed with him. However,
he presents no authority from which we can determine that counsel's constitutional challenges, if
raised, would have been sustained by the trial court. W.Y. has failed to show that there is a
reasonable probability that the result of the proceeding would have been different but for the alleged
error made by counsel. Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. W.Y. has failed to meet his
burden of proving ineffective assistance of counsel. Jackson, 973 S.W.2d at 956. Accordingly, we
overrule W.Y.'s sixth issue.


Conclusion

 The evidence is legally and factually sufficient to support the trial court's order of
commitment for temporary inpatient mental health services. W.Y.'s constitutional complaints have
not been preserved and his trial counsel was not ineffective.

 We affirm the trial court's order of commitment for temporary inpatient mental health
services.



 DIANE DEVASTO 

 Justice



Opinion delivered August 29, 2003.

Panel consisted of Worthen, C.J., Griffith, J., and DeVasto, J.













(PUBLISH)